# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BRETT E. COHEN, as personal and legal representative of the Estate of D.Q., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 08-480 (RMC) |
| DISTRICT OF COLUMBIA, *et al.*, | ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION

D.Q., a foster child and ward of the District of Columbia, was killed when he was transported by van to Progressive Life Center's offices for an appointment, and he exited the van and stepped into oncoming traffic. Brett Cohen, as personal and legal representative of the Estate of D.Q., brought suit against: the District of Columbia ("District"); Progressive Life Center ("Progressive") (the contractor that arranged for placement with foster parents and provided regular counseling and medical care to D.Q.); Nile Express Transport, Inc. ("Nile") (the company that operated the van that transported D.Q.); and William Woods (the driver of the oncoming car). The District of Columbia and Progressive have moved for summary judgment, asserting that Plaintiff does not present a constitutional Due Process claim under 42 U.S.C. § 1983. As explained below, the evidence does not meet the threshold required to demonstrate that the District or Progressive acted with deliberate indifference that shocks the conscience. Accordingly, the Court will grant in part and deny in part the motions for summary judgment filed by the District and Progressive. The Due Process claim will be dismissed and the remaining local law claims will be remanded to

Superior Court.

# I. FACTS

At the time of his death, D.Q. was an 11-year-old committed ward of the District of Columbia.[1]  The District had removed D.Q. from the care of his mother due to neglect on October 15, 1999.  3d Am. Compl. [Dkt. # 15] ¶ 8.  D.Q.'s father was not a part of his life, and he formally waived his parental rights in 2005.  *Id.*  On May 9, 2000, the District of Columbia Superior Court committed D.Q. to the District, and the D.C. Child and Family Services Agency ("CFSA") became his legal guardian.  *Id.* ¶ 9.  CFSA is the agency charged with managing the District's child welfare system.

On September 1, 2000, CFSA placed D.Q. with Progressive to receive therapeutic foster care services.  The District had contracted with Progressive to provide therapeutic services to foster children.[2]  Those services included assistance with placement into foster homes and mental

---

[1] D.Q. was born August 13, 1994.

[2] The foster care system in the District is governed by the Modified Final Order ("MFO") implemented in *LaShawn A. v. Kelly*.  *See LaShawn A. v. Kelly*, Civ. No. 89-1754 (D.D.C.), Modified Final Order [Dkt. # 222] approved Jan. 27, 1994. The MFO directed the District to take a number of actions, including hiring, training, monitoring, and supervising employees and contractors and monitoring contracts with private contractors.  CFSA created an Office of Licensing and Monitoring, including a Private Agency Program Monitoring Division responsible for monitoring foster care service providers like Progressive.  D.C.'s Ex. 7 [Dkt. # 91-6] at DC Confidential 2753.  On May 15, 2003, an Implementation Plan was adopted to bring the District into full compliance with the MFO.  *See LaShawn A. v. Fenty*, Civ. No. 89-1754, 2010 WL 1270202, at *3 (D.D.C. Apr. 5, 2010).  The MFO was incorporated into the contract between the District and Progressive.  D.C.'s Ex. 3 [Dkt. # 87] at DRDR000342.  The District, via its program monitor, oversaw Progressive's performance of its duties under the contract; a program monitor visited Progressive at least once per month.  *See, e.g.*, D.C.'s Ex. 5 [Dkt. # 89-4] at DC Confidential 1290-96 (minutes of June 28, 2006, meeting at Progressive attended by CFSA Program Monitor).  Beginning in March 2006, CFSA distributed "performance scorecards to its private contractors to monitor the care providers' expected outcomes and benchmarks derived from the 2003 LaShawn Implementation Plan."  District's Statement of Undisputed Material Facts [Dkt. # 72] ("D.C.'s SUMF") ¶ 711.

health counseling.  *Id.* ¶ 10.  The services provided to D.Q. included weekly psychotherapy sessions.

From October 2002 to his death in July 2006, D.Q.'s  psychotherapist was Anne Harshaw Smith.

D.Q. had a history of mental health problems, including hyperactivity and impulsiveness.  Ms. Smith observed that D.Q.'s behavior vacillated — he went through periods of stability and instability.  Pl.'s Ex. 5 [Dkt. # 109-4] ("Smith Dep.") at 35, 39-40.  D.Q. sometimes talked to Ms. Smith about wanting to hurt himself.  Smith Dep. at 65.

D.Q.'s instability led to hospitalization at the Psychiatric Institute of Washington three times — in 2002, 2004, and 2006.  D.Q. was admitted to the Institute on May 2, 2006, for a 21 day in-patient mental examination after an "out of control episode" at his foster home when he threatened to kill his foster parent and grandmother.  D.C.'s Ex. 1D [Dkt. # 85] at D.C. Confidential 4627-4632.  D.Q.'s then foster mother, Arnette Walker, indicated that D.Q. had been aggressive and threatened her.[3]  *Id.* at 4630.  Ms. Smith testified that D.Q. was hospitalized because he had made "suicidal gestures."  Smith Dep. at 95.

During the 2006 stay at the Institute, Dr. Terry Jarrett diagnosed D.Q. with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and Parent-Child Relational Disorder. D.C.'s Ex. 1D [Dkt. # 85] at D.C. Confidential 4627.   Dr. Jarrett also noted D.Q.'s history of suicidal ideation.  *Id.* at 4629.  Dr. Jarrett prescribed Concerta, Zoloft, and Risperdal in an attempt to ameliorate D.Q.'s mental health problems.  *Id.* at 4627.  On May 22, 2006, the Institute discharged D.Q. to his foster parent, Ms. Walker, and Dr. Jarrett recommended continued outpatient mental health services.  *See id.* at 4628, 4632; *see also* D.C.'s SUMF ¶ 734.

---

[3] D.Q. had been placed with Ms. Walker since 2005.  D.C.'s Ex. 1D [Dkt. # 85] at D.C. Confidential 4629 [Dkt. # 85].

On July 10, 2006, eight days before his death, D.Q. was placed with Joseph and Kawana Gerald, new foster parents who lived in Upper Marlboro, Maryland. The very next day, July 11, Adrian Gayle, a social worker employed by Progressive, met with D.Q. and the Geralds. The Geralds told Mr. Gayle that they had not given D.Q. any of his medications, and that they did not believe that D.Q.'s prior foster parent had administered any medication. Pl.'s Ex. 15 [Dkt. # 110-5] ("Gayle Dep.") at 48-51. Mr. Gayle observed that D.Q. appeared to be happy and stable. Gayle Dep. at 53. Further, Mrs. Gerald told Mr. Gayle that D.Q. was not showing any difficulty other than bed-wetting. D.C.'s Ex. 1D [Dkt. # 85-1] at D.C. Confidential 4919.

As a result of the July 11 meeting with D.Q.'s foster parents, Mr. Gayle promptly arranged for a psychiatric consultation for the purpose of reviewing D.Q.'s medications. *Id*. at 4917-19. Dr. Benjamin Adewale, a medical doctor who is board certified in psychology and neurology, conducted the evaluation on July 15. On that day, Dr. Adewale put D.Q. back on prescriptions for Concerta and Risperdal, but discontinued the prior prescription for Zoloft because he did not believe it was necessary for D.Q.'s treatment.[4] D.C.'s Ex. 1D [Dkt. # 85-1] at D.C. Confidential 4900, 4910, 4917. Dr. Adewale indicated that although D.Q. had been off his medication for approximately two weeks, D.Q. still had medication in his system "so the two week lack has not affected him as of yet." *Id*. at 4917. Dr. Adewale testified at his deposition that he would have put D.Q. in the hospital if he thought that D.Q. was a danger to himself or others. D.C.'s Ex. 23 [Dkt. # 97] ("Adewale Dep.") at 70.

Although Ms. Smith continued in her role as psychotherapist to D.Q. in the months

---

[4] Previously, on June 10, 2006, Dr. Adewale had continued D.Q. on medications prescribed while D.Q. was at the Psychiatric Institute of Washington, namely Concerta, Risperdal, and Zoloft. D.C.'s Ex. 1D [Dkt. # 85-1] at DC Confidential 4910.

before his death, the two weekly appointments immediately before his death were cancelled. The July 4 appointment was cancelled due to the holiday and the July 11 appointment was cancelled due to D.Q.'s attendance at summer camp. D.C.'s Ex. 1D [Dkt. # 85-1] at D.C. Confidential 4923, 4922.

The accident that killed D.Q. occurred on July 18, 2006. On that day at around 1:00 p.m., Nile[5] transported D.Q. by van to Progressive's office at 1933 Montana Avenue, N.E.,[6] for a therapy session. The van driver, Rejino Stultz, parked across the street from the office in the middle of the block.

Mr. Stultz had driven D.Q. approximately three times per week for the prior two years. D.C.'s Ex. 24 [Dkt. # 97] (Stultz Dep.) at 32-33. Usually, D.Q. would get out of the car and wait at the back for Mr. Stultz to come around and get chips and juice out of the back of the van for him. *Id*. at 56-57. Mr. Stultz would then walk him across the street to Progressive. Pl.'s Ex. 13 [Dkt. # 110-3] (Stultz Dep.) at 108-09. Mr. Stultz had not had any prior unusual incidents involving D.Q. *Id*. at 13. On the day of the accident, Mr. Stultz observed D.Q. to be happy and enjoying himself, as he had been attending summer day camp. *Id*. at 137.

When Mr. Stultz parked the van across Montana Avenue from the Progressive offices and before Mr. Stultz got out of the van, D.Q. stepped out and started across the street.[7] A car driven by William Woods struck D.Q. D.Q. suffered serious injuries and was transported to Children's

---

[5] The District's Medicaid transportation office contracted with Nile for non-emergency transportation services for qualified individuals, including D.Q. Pl.'s Opp'n [Dkt. # 107] at 1-2.

[6] During the day, this portion of Montana Avenue has parking on each side and two lanes for travel.

[7] According to Mr. Stultz, D.Q. exited the front passenger seat of the van. Pl.'s Ex. 13 [Dkt. # 110-3] (Stultz Dep.) at 21-22. According to a Progressive employee who saw the events from her office window, D.Q. jumped out of the left back side of the van.

Hospital, where he died two days later.

As a result, Plaintiff brought a six count complaint against the District, Progressive, Nile, and Mr. Woods as follows:

> Count I (against the District, Progressive, and Nile) – wrongful death based on negligence;
>
> Count II (against the District, Progressive, and Nile) – survival action based on negligence;
>
> Count III (against the District, Progressive, and Nile) – negligent hiring, training, and supervision;
>
> Count IV (against Woods) – survival action based on negligence;
>
> Count V (against the District and Progressive) – violation of constitutional Due Process via 42 U.S.C. § 1983; and
>
> Count VI (against Progressive and Nile) – punitive damages.

*See* 3d Am. Compl. [Dkt. # 15]. With regard to the Due Process claim, the Complaint alleges:

> 74. The District and Progressive were charged by Court Order with the sole legal custody and responsibility for the care and treatment of D.Q. This included providing the most basic of needs – a safe and secure place to live as well as adequate supervision and protection. The District and Progressive violated D.Q.'s right to safe conditions and security from physical harm — a right guaranteed by the due process clauses of the U.S. Constitution — and/or acted with deliberate indifference to that right, and/or failed to exercise professional judgment to protect that right.
>
> 75. The District and Progressive violated D.Q.'s right to adequate and appropriate medical and psychological care and treatment – a right guaranteed by the due process clauses of the U.S. Constitution, and/or acted with deliberate indifference to that right, and/or failed to exercise professional judgment to protect that right.
>
> . . . .
>
> 77. The failures of the District and Progressive were based in and due

to, among other things, their corporate customs, policies and practices and/or were due to their failure to adequately train and/or supervise their employees and agents. Such failures include those failures that have been described above.

*Id.* ¶ 74, 75, 77.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Id.*; *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.* In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

On summary judgment, the nonmoving party has an obligation to point to evidence creating an issue of material fact; evidence laying dormant in the record is insufficient. *Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009). A district court is not obligated to "sift and sort through" relevant facts in order to ascertain whether material disputes of fact exist. *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996).

### III. ANALYSIS

Plaintiff seeks to hold the District and Progressive liable for D.Q.'s death under 42 U.S.C. § 1983, alleging violations of his constitutional right to Due Process. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

To make out a § 1983 claim, a plaintiff must demonstrate a violation of a

constitutional right. "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

## A. Substantive Due Process

Plaintiff alleges that the District and Progressive violated the Due Process "clauses" of the U.S. Constitution by violating D.Q.'s right to "adequate supervision and protection" and "to adequate and appropriate medical and psychological care and treatment." *See* 3d Am. Compl. ¶¶ 74-75. Plaintiff refers to the Due Process clauses of the Fifth and Fourteenth Amendments. Because the District of Columbia is a political entity created by the federal government, it is subject to the Fifth Amendment and not the Fourteenth, which applies to the States. *Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)); *see Estate of Gaither v. District of Columbia*, Civil No. 03-1458, 2009 WL 2916430, at *13 n.10 (D.D.C. Sept. 8, 2009) ("Individuals suing the District for constitutional due process violations must do so under the Fifth Amendment, and not the Fourteenth . . . ."). The Fifth Amendment provides in pertinent part that no person "shall be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. The ultimate legal analysis is the same. Thus, cases analyzing the liability of States under the Due Process clause of the Fourteenth Amendment can be relied upon to analyze the District's liability under the Due Process clause of the Fifth Amendment.

Generally, the State does not have a general duty to protect individuals from harm caused by private actors. *DeShaney v. Winnebago County Social Servs. Dep't*, 489 U.S. 189, 197 (1989). In *DeShaney*, the Supreme Court held that a child who was severely beaten by his father did

not have a Due Process claim against the State social service agency which failed to remove him from his father's custody — even though agency personnel had reason to know of the physical abuse. *Id*. at 202-03. There are two exceptions to this general rule: (1) when a State holds an individual in custody, it owes a duty to protect that individual and (2) when a State creates or increases the danger to the individual, it owes a duty to protect the individual. *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992). A child in foster care is in custody for substantive Due Process purposes and a State (or the District) owes the child a constitutional duty of care. *Smith v. District of Columbia*, 413 F.3d 86, 95 (D.C. Cir. 2005). "[W]hen the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties. The failure to perform such duties can give rise, under sufficiently culpable circumstances, to liability under section 1983." *Nicini*, 212 F.3d at 808.

Plaintiff proceeds under the theory that the District owed D.Q. a duty to protect him from physical harm while he was in the custody of the District as a ward and foster child. Plaintiff also alleges that Progressive was a "state actor" that can be found liable under § 1983 because it owed D.Q. the same duty to protect him from physical harm.[8] Plaintiff claims that Progressive and the District are liable because they failed to ensure that D.Q. consistently took his medications; they failed to provide an assistant in transporting D.Q.; and they failed to ensure that there was adequate off-street parking available at Progressive.

In order to establish a substantive Due Process claim, a plaintiff must show that the

---

[8] Plaintiff filed a motion for partial summary judgment, seeking a ruling that Progressive was a "state actor" for purposes of § 1983 liability. *See* Pl.'s Mot. for Partial Summ. J. [Dkt. # 79]. For the purpose of this Memorandum Opinion, the Court presumes that Progressive is a state actor. However, because the Court ultimately finds that Plaintiff has not presented a cognizable Due Process claim, Plaintiff's motion for partial summary judgment will be denied as moot.

state actor was deliberately indifferent to his constitutional rights and that such conduct shocks the conscience. *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006). This "stringent requirement exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law." *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001). Negligence alone is insufficient to establish a claim under § 1983. *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *see also County of Sacramento*, 523 U.S. at 849 ("the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). The Due Process clause "does not transform every tort committed by a state actor into a constitutional violation." *DeShaney*, 489 U.S. at 202.

For example, in *DeAnzona v. City and County of Denver*, 222 F.3d 1229 (10th Cir. 2000), the parents of a child who drowned while attending a city/county-sponsored summer day camp brought suit against the City and County of Denver alleging a Due Process violation under § 1983. *Id.* at 1233. The evidence showed that the plaintiffs' five-year-old son was playing cards with a counselor and other children; then, the counselor watched the boy walk twenty-five yards toward the lake edge where two other counselors were supervising children who were fishing; the counselor turned her back to the boy before he actually reached the other counselors; he was found drowned in the lake the next morning. *Id.* Plaintiffs alleged that the camp director failed to train the counselors adequately; failed to define the counselor's jobs clearly; failed to provide cell phones to the counselors; failed to require that children attending the camp be able to swim; failed to erect a barricade around the lake; failed to have a system to identify the children's location at the camp at any time; and failed to have a system to differentiate campers from non-campers. Finding that the

camp director's failure to do these things did not rise to the level of deliberate indifference, the court of appeals determined that the district court erred by denying summary judgment to the City and County of Denver. *Id*. at 1235. The "[l]ack of diligence in watching a child walk twenty-five yards is not reckless disregard . . . Not paying enough attention to a child and thus allowing the child to wander away and drown is terribly tragic, and possibly even negligent. However, mere negligence does not shock the conscience." *Id*. at 1236.

It is not clear whether the deliberate indifference standard is subjective or objective in the foster care context, that is, whether deliberate indifference is shown when an official fails to act in light of a risk that the official *actually* knows about or in light of a risk that the official *should have* known about. In the prison context, the Supreme Court has determined that the subjective standard applies, that "a prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In the prison context, unlike foster care, the State controls all aspects of a prisoner's life. Nevertheless, some circuits have held that the same subjective standard for deliberate indifference applies. *See A.P. ex rel. Bazerman v. Feaver*, 293 Fed. Appx. 635, 654 (11th Cir. 2008) (deliberate indifference standard requires that the plaintiff demonstrate that the defendant *actually* knew of a substantial risk of serious harm or deliberately chose not to learn of the abuse); *James ex rel. James v. Friend*, 458 F.3d 726, 730 (8th Cir. 2006) ("Deliberate indifference will be found only if the officials *were aware* of facts from which an inference could be drawn that a substantial risk of serious harm existed and the officials actually drew that inference.") (emphasis added); *but see Hernandez ex rel. Hernandez v. Texas*

*Dep't of Protective and Regulatory Servs.*, 380 F.3d 872, 881 (5th Cir. 2004) (deliberate indifference may be inferred when the risk of harm is obvious).

For example, in *White v. Chambliss*, 112 F.3d 731 (4th Cir. 1997), the court applied the subjective standard and dismissed a Due Process claim brought on behalf of a child who was killed by abusive foster parents. The evidence did not show that the department of social services knew or suspected that the foster parents were abusive. "A claim of deliberate indifference, unlike one of negligence, implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice. There is simply no evidence that the [social service agency] defendants were on notice of any problem at the time the placement decision was made." *Id*. at 737.

In *Nicini*, the Third Circuit found that it was not necessary to decide whether the subjective or objective standard applies to a claim for deliberate indifference because the plaintiff did not point to sufficient evidence to show deliberate indifference under either standard. There, the State of New Jersey placed a runaway teen with a foster family, and the foster father sexually assaulted the teen. 212 F.3d at 801-04. While New Jersey had a duty to protect the teen, the court found that it had not violated the teen's right to substantive Due Process. Assuming *arguendo* that the deliberate indifference standard in the foster care context is objective, the court found that the case worker who investigated the foster family and recommended the youth's placement did not act with deliberate indifference in the face of a risk of which he should have been aware. Sixteen years before, the foster father had been convicted in New York of corrupting the morals of a minor and distributing controlled substances to minors. *Id*. at 804. When the caseworker investigated the family before the teen was placed, he did not discover this information. In accordance with New

Jersey policy, the caseworker conducted a "perpetrator" check in the New Jersey Division of Youth and Family Services central data base; the check revealed no criminal information regarding the family. *Id*. at 812. The caseworker did not conduct a national police search, and the court found that this failure did not constitute deliberate indifference. There was no information before the caseworker that would indicate that the teen faced a substantial risk of serious harm and thus there was no evidence that the caseworker knew or should have known of the risk of harm to the teen. *Id*. at 815.[9]

Like the court in *Nicini*, this Court need not decide whether the subjective or objective standard applies to deliberate indifference in the foster care context. Drawing all justifiable inferences in the favor of Plaintiff and accepting the Plaintiff's evidence as true, *see Anderson*, 477 U.S. at 255, Plaintiff has failed to establish that the District and Progressive knew or should have known that D.Q. was at substantial risk of harm, and that they failed to act in the face of such a risk. Plaintiff alleges deliberate indifference with regard to two categories of conduct: (1) alleged deficiencies in the psychiatric care of D.Q. and the management of his medications and (2) alleged deficiencies in transportation and parking. Like the allegations in *DeAnzona*, *White*, and *Nicini*, these allegations at most may state a claim in negligence.[10]

---

[9] In *Burton v. Richmond*, 370 F.3d 723 (8th Cir. 2004), children claimed that their Due Process rights were violated when social workers failed to conduct a background check before placing them in a relative's home and failed to remove them promptly following allegations of sexual abuse. Because some of the children had been placed successfully with those relatives years before, the court found that the failure to conduct a background check was at most negligent. *Id*. at 729. Although the children's mother complained to the social workers of possible sexual abuse by the relatives, the failure to remove the children promptly after receiving this notice was not deliberately indifferent. *Id*. The court implied that the mother lacked credibility because she had previously abandoned the children and was attempting to reassert her parental rights. *Id.*

[10] This Court does not reach and does not decide the issue of negligence.

Plaintiff claims that Progressive and the District are liable because they failed to ensure that D.Q. consistently took his medications, speculating that if he had been taking his medication he would not have run impulsively into the street. Plaintiff further alleges that the District and Progressive should have had policies and procedures in place regarding the administration of medications. D.Q. did not take his medications for approximately two weeks preceding his July 15, 2006, visit with the psychiatrist, Dr. Adewale. Dr. Adewale examined D.Q. just three days before D.Q. died; Dr. Adewale did not find D.Q. to be dangerous to himself or others, and he noted that D.Q. had sufficient medication still in his system such that he had suffered no ill effects from being off the medication.

The parties dispute whether D.Q. actually *had* sufficient medication in his system at the time of his death. Plaintiff claims that the toxicology report is not conclusive on this point and that while certain medications were still in his system, others were not, or at least not enough to be effective. The District contends that D.Q. had medication in his system in a medically effective amount. This factual dispute is not material to the question before the Court. Even presuming that the lack of medication was the proximate cause of D.Q.'s death, the critical question is whether the District and Progressive's acts, or failures to act, constituted deliberate indifference that shocks the conscience. In *DeAnzona*, the court noted that the failure to watch the child actually reach the counselors by the lake may have been negligent, but was not deliberately indifferent. *DeAnzona*, 222 F.3d at 1236. Similarly here, the failure to ensure that others administered medications to D.Q. consistently before the accident may have been negligent, but it simply does not constitute deliberate indifference that "shocks the conscience." Plaintiff has not shown that the District and Progressive knew or should have known that D.Q.'s insufficient medication in the two weeks before July 15

would result in his crossing the street in front of an oncoming car on July 18.

Moreover, there is no evidence that D.Q. was experiencing any particular emotional or behavioral problem in the weeks immediately before his death that should have put the District or Progressive on notice that D.Q. was at risk of serious harm. *See Nicini*, 212 F.3d at 815 (plaintiff failed to point to anything that should have put the caseworker on notice that the teen faced a serious risk of abuse by his foster father). The social worker assigned to D.Q.'s case, Mr. Gayle, indicated that D.Q. appeared to be happy and stable when he saw him on July 11, a week before the accident. Mrs. Gerald, D.Q.'s foster mother from about July 10, 2010 until his death on July 18, did not report any problems to Mr. Gayle other than bedwetting. Mr. Stultz had driven D.Q. to appointments approximately three times per week for the past two years without incident. Mr. Stultz did not see anything unusual about D.Q.'s behavior on the day of the accident; he testified that D.Q. seemed happy to be attending summer day camp. Further, when Mrs. Gerald told Mr. Gayle that she had not been giving D.Q. his medication, Mr. Gayle did not sit idly by; he immediately arranged for Dr. Adewale to evaluate D.Q. Dr. Adewale evaluated D.Q. just four days before the accident and he did not find D.Q. to be a danger to himself or others. He opined that D.Q. had sufficient medication in his system on July 15 such that he had not suffered negative effects. Dr. Adewale placed D.Q. back on prescribed medications that very day. The record as a whole reveals great attention to D.Q. and his needs. Plaintiff has failed to point to evidence sufficient to show that the District or Progressive acted, or failed to act, with deliberate indifference that shocks the conscience.

Plaintiff also points out that D.Q. did not see his psychotherapist, Ms. Smith, for almost three weeks before his death. This is not evidence constituting deliberate indifference.

D.Q.'s appointment on July 4 was cancelled due to the July 4 holiday, and his appointment on July 11 was cancelled because D.Q. was busy at camp. No reasonable jury could find that the District or Progressive knew or should have known that missing two appointments with his psychotherapist would cause D.Q. to step in front of an oncoming car.

Plaintiff further argues that the District and Progressive should have known of the danger that D.Q. would jump out of a car into traffic based on three incidents that occurred when D.Q. was seven years old. In November of 2001, D.Q. ran out of a psychotherapy session and continued to run around the Progressive office building. D.C.'s SUMF ¶ 150. Two months later, in January of 2002, D.Q. ran around his elementary school, failing to respond to instructions by his teachers and counselors. *Id*. ¶ 170. The next month, D.Q. jumped out of a moving car after allegedly being hit by his foster mother. *Id*. ¶¶ 189, 192, 201. These events occurred more than four years before the accident resulting in D.Q.'s death, and Plaintiff does not allege any more recent incidents of this kind. Mr. Stultz, in fact, had transported D.Q. regularly for the past two years without incident. Given the passage of time without any evidence of similar behavior, the District and Progressive's failure to take action to prevent eleven-year-old D.Q. from exiting the van and crossing the street on the day of his death could not have been deliberately indifferent. No reasonable juror could find that they knew or should have known that there was a substantial risk that D.Q. would step into traffic.

Plaintiff also alleges that Progressive and the District are liable because they failed

to provide an attendant to assist the driver in transporting D.Q.,[11] implying that an assistant would have prevented D.Q. from exiting the van or would have escorted D.Q. safely across the street. Further, Plaintiff claims that these defendants failed to ensure that there was adequate parking available at Progressive and failed to ensure that the van actually parked in the Progressive lot instead of across the street. These alleged failures do not amount to deliberate indifference that shock the conscience. No reasonable juror could find that the District or Progressive knew or should have known of a substantial risk to D.Q.'s safety because the van parked on the street instead of in the lot or because there was no attendant accompanying the driver. Therefore, Plaintiff's Due Process claim (Count V) against the District and Progressive will be dismissed.

### B. Custom or Policy

Not only has Plaintiff failed to demonstrate a Due Process violation, he also has failed to point to any custom or policy that caused the alleged constitutional violation. To impose liability on the District under 42 U.S.C. § 1983, a plaintiff must show not only a violation of his rights under the Constitution, but also that the District's custom or policy caused the violation. *Feirson v. District of Columbia*, 506 F.3d 1063, 1066 (D.C. Cir. 2007); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). A single incident is insufficient to impose liability against the District. *Monell*, 436 U.S. at 694. With regard to a claim of failure to train, a city can be liable under § 1983 only where the failure to train

---

[11] Although the District and Progressive did not specifically request an attendant, Nile billed the District for an attendant and the District paid for an attendant. Despite such payment, it is undisputed that no attendant accompanied D.Q. in the van on the day of his death or earlier. Mr. Stultz had previously accompanied D.Q. to the Progressive facility.

reflects a deliberate or conscious choice by a municipality, *i.e.* a custom or policy. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).[12]

Plaintiff likens this case to *Smith v District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005), where a grandmother sued the District for a Due Process violation related to the murder of her grandson while he was in the District's custody. The D.C. Circuit affirmed the district court's denial of judgment as a matter of law on the issue of deliberate indifference. The plaintiff's grandson was a teen who had been adjudicated a "delinquent youth" and placed in an "independent living program" where troubled youths live in program-provided apartments with certain restrictions on their activities and supervision by staff. 413 F.3d at 89. The District had contracted with a private company to provide the independent living program, and the jury found that the District had acted with deliberate indifference where the evidence showed that the District had no standards whatsoever for selecting and monitoring such contractors, no tracking of site safety, and no staffing standards. *Id*. at 92. Further, the District had taken no noteworthy steps in response to two prior violent assaults on youths in this particular independent living program. The Circuit explained:

> From such evidence, the jury could have reasonably concluded that "the need for more or different" standards for selecting and monitoring independent living programs for juvenile delinquents was "so obvious and the inadequacy so likely to result in the violation of constitutional rights" that it constituted a deliberately indifferent custom or policy.

*Id*. at 100. Plaintiff contends that the District's lack of policies to monitor the management of medication and transportation of foster children constitutes a deliberately indifferent custom or

---

[12] There is no *respondeat superior* or vicarious liability under § 1983. *Burnett v. Sharma*, 511 F. Supp. 2d 136, 141 (D.D.C. 2007).

policy.

The facts of this case are nothing like those presented in *Smith*. While the District's foster care system may have lacked sufficient standards before *LaShawn* and the implementation of the MFO, in 2003, an Implementation Plan was adopted to bring the District into full compliance with the MFO. *See LaShawn*, 2010 WL 1270202, at *3. The MFO directed the District to take a number of actions, including hiring, training, monitoring, and supervising employees and contractors such as Progressive. The MFO was incorporated into the contract between the District and Progressive. D.C.'s Ex. 3 [Dkt. # 87] at DRDR000342. The District's program monitor oversaw Progressive and visited Progressive at least once per month. *See, e.g.*, D.C.'s Ex. 5 [Dkt. # 89-4] at DC Confidential1290-96 (minutes of June 28, 2006, meeting at Progressive attended by CFSA Program Monitor). CFSA distributed "performance scorecards to its private contractors to monitor the care providers' expected outcomes and benchmarks derived from the 2003 LaShawn Implementation Plan." D.C.'s SUMF [Dkt. # 72] ¶ 711. In performing its duties under its contract with the District, Progressive prepared an individual treatment plan for D.Q., setting short and long term goals for improvement of his clinical, social, and educational status. D.C.'s Ex. 1A [Dkt. # 82] at DC Confidential 3046-3052. As part of this plan, Progressive provided a psychotherapist, Ms. Smith, and a psychiatrist, Dr. Adewale, to D.Q. D.Q. was regularly seen and evaluated by these professionals. When the social worker, Mr. Gayle, learned that D.Q. had not been on his medications, he promptly arranged for Dr. Adewale to evaluate D.Q. and adjust his medications. These circumstances stand in stark contrast to the District's complete failure to set standards and to monitor the independent living provider in the *Smith* case.

Further, contrary to Plaintiff's assertion, there was not a complete lack of policies regarding transportation of foster children. Nile contracted to provide Medicaid transportation services for District patient. D.C.'s Ex. 21 [Dkt. # 96] at DRD000353-360. Under the contract, Nile was required to "satisfy all requirements of the Social Security Act, as amended, and be in full compliance with the standards prescribed by Federal and State standards." *Id.* at DRD000354. Further, Nile was required to comply with D.C. Code § 12-238, which prohibits Medicaid providers from employing anyone who is not a licensed healthcare professional who has undergone a criminal background check and which prohibits the employment of individuals who have been convicted of certain offenses. *Id.* at DRD000355. The contract also requires compliance with 42 U.S.C. § 31306 and 42 C.F.R. § 382, which require employers of commercial drivers to conduct "pre-employment, reasonable suspicion, and post-accident testing for controlled substances." *Id.* Nile was required to submit to the District licensure and certification documentation regarding its staff. *Id.* at DRD000355-356. Again, these facts contrast with *Smith* where the District completely failed to set standards when it should have known about the risk of violence to the youths in the contractor's independent living program. As noted above, no reasonable juror could find that the District knew or should have known of a substantial risk to D.Q.'s safety because the van parked across the street or because there was no attendant accompanying the driver. Due Process does not require the District to set standards, oversee, and monitor every single detail of a contractor's performance (such as where the contractor parks) without some notice that such is necessary to keep its charges safe.

### C.  Supplemental Jurisdiction

Each of Plaintiff's remaining claims assert violations of D.C. law. The Court does

not have diversity jurisdiction over this matter because there are litigants from the District on opposing sides of the controversy. *See* 28 U.S.C. § 1332(a)(1); *Prakash v. American Univ.*, 727 F.2d 1174, 1178 n.25 (D.C. Cir. 1984). Even though Plaintiff is a resident of Maryland, D.Q. was a resident of the District of Columbia and Plaintiff brings this action as the personal representative of D.Q.'s Estate. The legal representative of the estate of a decedent is deemed to be a citizen only of the same state as the decedent. *See* 28 U.S.C. § 1332(c)(2). Because Plaintiff is deemed to be a citizen of the District and the District is a defendant, there is no diversity in this matter.

Accordingly, the Court maintains only supplemental jurisdiction over the local law claims in this case. *See* 28 U.S.C. § 1367(c). After dismissing all federal law claims over which it has original jurisdiction, a district court may decline supplemental jurisdiction under § 1367(c). 28 U.S.C. § 1367(c)(3); *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005). The decision whether to exercise supplemental jurisdiction after dismissing every claim over which the court had original jurisdiction is "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866 (2009). In exercising such discretion, district courts consider judicial economy, convenience, comity, and fairness. *Shekoyan*, 409 F.3d at 424. In the usual case, these factors point toward declining jurisdiction. *Id*. (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). In *Shekoyan*, the D.C. Circuit held that even where the litigation proceeded for four years before the federal claims were dismissed, the district court did not abuse its discretion in declining supplemental jurisdiction. *Id*. at 424. The Supreme Court has instructed that "[c]ertainly, if the federal claims [supporting supplemental jurisdiction] are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine*

*Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

Because the Court will dismiss the only claim under federal law, the Court will decline to exercise supplemental jurisdiction over Plaintiff's remaining local law claims. Those local law claims will be remanded to Superior Court.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the District's motion for summary judgment [Dkt. # 72] and Progressive's motion for summary judgment [Dkt. # 78] as follows:  Count V of the Third Amended Complaint alleging a constitutional Due Process violation pursuant 42 U.S.C. § 1983 will be dismissed; summary judgment will be denied without prejudice regarding the remaining local law claims.  Plaintiff's motion for partial summary judgment [Dkt. # 79] will be denied as moot.  The case will be remanded to Superior Court and all other pending motions will be decided there.[13]  A memorializing Order accompanies this Memorandum Opinion.

Date: October 8, 2010                        _____/s/_____
                                             ROSEMARY M. COLLYER
                                             United States District Judge

---

[13] The other pending motions include: (1) motion for summary judgment filed by Liberty Mutual Insurance Company [Dkt. # 71]; (2) motion for partial summary judgment against Liberty filed by the District [Dkt. # 75]; (3) motion in limine filed by Progressive [Dkt. # 76]; and (4) motion in limine filed by the District [Dkt. # 77].